MOLTEN METAL EQUIPMENT, INNOVATIONS, INC.,
Plaintiff,

v.

METAULLICS SYSTEMS CO., L.P., et al., Defendants.

No. 1:97CV2244.

United States District Court, N.D. Ohio, Eastern Division.

Jan. 31, 2001.

918

Timothy J. O'Hearn, Thomas A. Briggs, Benjamin Harry Beryll Sley, Jones, Day, Reavis & Pogue, James A. DeRoche, Garson & Associates, Cleveland, OH, for Molten Metal Equipment Innovations, Inc., plaintiffs.

Harry D. Cornett, Jr., Robert J. Hanna, Arter & Hadden, Jay R. Campbell, Gordon Dyche Kinder, II, Esq., Renner, Otto, Boisselle & Sklar, Cleveland, OH, for Metaullics Systems Co., L.P., Metaullic Systems Co, defendants.

### MEMORANDUM AND ORDER

ALDRICH, District Judge.

The plaintiff, Molten Metal Equipment Innovations, Inc. ("MMEI"), brought this patent infringement action against the defendants, Metaullics Systems Co., L.P., and Metaullics Systems Co. (collectively, "Metaullics"), alleging that Metaullics had infringed several of the claims of U.S. Patent No. 5,203,681 to Cooper ("the Cooper patent"). After lengthy pre-trial proceedings, the parties tried the issues of literal infringement and infringement under the doctrine of equivalents to a jury. The jury returned a special verdict finding that Metaullics had not literally infringed any of the claims of the Cooper patent, but that it had infringed several of the claims under the doctrine of equivalents. The Court held a hearing to determine the appropriateness and scope of equitable relief. Following the hearing, the Court entered a permanent injunction enjoining Metaullics from further infringement of the Cooper patent and from selling replacement parts for infringing pumps. The parties then tried the issue of damages to the jury, which returned a verdict awarding MMEI $3 million in damages and finding that Metaullics had willfully infringed the Cooper patent.

Metaullics timely renewed its motion for judgment as a matter of law, and both parties timely moved for a new trial. On November 29, 2000, the Federal Circuit published its opinion in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558, 56 U.S.P.Q.2d 1865 (Fed.Cir. 2000) (en banc). Both parties have briefed the applicability of *Festo* to the present case. For the following reasons, the Court holds (1) that Metaullics is entitled to a new trial because several of the questions propounded to the jury on the special verdict form were erroneous and prejudicial; and (2) that Metaullics is not entitled to judgment as a matter of law.

### 1. Facts and Relevant Prior Proceedings

Both MMEI and Metaullics are in the business of manufacturing and selling submersible molten metal pumps and pump replacement parts. Such pumps have several uses: a "circulation pump" circulates a molten metal such as aluminum within a furnace for the purpose of ensuring homogeneous temperature and alloy mix throughout the furnace, thereby reducing fuel consumption and increasing production; a "transfer pump" transfers molten metal from one furnace to another; a "gas-injection pump" circulates the metal and adds a gas to it for the purpose of removing dissolved elements such as hydrogen or magnesium from the molten metal.

Several industries, including the automobile industry, use submersible molten metal pumps in their production processes.

Paul Cooper, the inventor of the submersible molten metal pump described in the Cooper patent, and president of MMEI, filed his application for a patent on August 21, 1991. Claim 19 of the patent, as submitted with his application, claimed:

A pump assembly for a submersible molten metal pump comprising a casing having defined therein a pump chamber for housing an [sic] rotor, at least one inlet opening into said chamber and discharge opening having an axis aligned tangentially to said chamber; an exit adaptor; and means for mounting said exit adaptor at said discharge opening.

On July 31, 1992, the patent examiner rejected, *inter alia*, Claim 19 on the grounds that it was clearly anticipated by U.S. Patent No. 4,786,230 to Thut. On October 2, 1992, in response to the rejection of Claim 19, Cooper amended Claim 19 to read as follows:

A pump assembly for a submersible molten metal pump comprising a casing having defined therein a *non-volute* pump chamber for housing a rotor, at least one inlet opening into said chamber and discharge opening having an axis aligned tangentially to said chamber; an exit adaptor; and means for mounting said exit adaptor at said discharge opening.

(Emphasis supplied). In the remarks accompanying the amendment, Cooper wrote:

Claims 19–24, as originally submitted, were rejected under 35 U.S.C. § 102(b) as being anticipated by Thut. Applicant respectfully submits that claim 19, as amended, recites subject matter which is neither disclosed nor suggested in Thut. Claim 19, upon which claims 20–24 are dependent, recites a pump assembly for a submersible molten metal pump, comprising a casing having defined therein a non-volute pump chamber for housing a

rotor.... Thut discloses a dual volute molten metal pump ...

As discussed in the interview of September 29, an important element of the claimed invention, which is not disclosed or suggested in the prior art, is the fact that the pump chamber is non-volute. Thut discloses, and in fact requires, a volute portion in the pump housing....

On December 28, 1992, the patent examiner allowed the application. The patent was issued on April 20, 1993.

In the early stages of this litigation, the Court held *Markman* hearings for the purpose of defining the meaning of certain disputed claim terms. The Court defined a "volute pump chamber" thus:

A three-dimensional region wherein fluid is subjected to the force of an impeller, with a spiral casing, such that, when viewed circumferentially, the cross-sectional area of the chamber generally increases as the outlet of the pump chamber is approached. "Viewed circumferentially" means viewed along the path that the liquid in the chamber follows; *i.e.*, rotating around the chamber, in the direction of the outlet. The "cross-sectional area" refers to the area defined that is between the pump chamber wall and the outer edge of the impeller. "Generally increases" does not mean that the increase must be constant; however, the "widest" point must occur at the outlet of the pump, or as the outlet of the pump is approached, and the narrowest point occurs at the cutwater (or the outer edge of the outlet).

A "non-volute pump chamber," the Court held, is simply any pump chamber that is not a volute pump chamber. The pump chambers of the pumps that MMEI claimed infringe the Cooper patent all have a generally increasing cross-sectional area as the outlet of the chamber is approached. The pump with the least significant curvature shows an increase from nine inches to approximately ten inches, i.e., an increase of more than ten percent.

Because each of its accused pumps had a generally increasing cross-sectional area, Metaullics moved for summary judgment on the issue of infringement. The Court denied summary judgment on the issue of literal infringement as to some of the pumps on the grounds that "the curves depicted are not so infinitesimal that they cannot be considered spiral," but that "the curves do not increase in such a proportion that this Court can declare them spiral as a matter of law." There was no dispute that the accused pumps had a generally increasing cross-sectional area; therefore, the summary judgment order must be interpreted to mean that the Court's definition of "volute pump chamber" has two elements: (1) the pump chamber must have a "spiral" casing; and (2) the cross-sectional area of the chamber must generally increase as the outlet of the pump chamber is approached. The Court also denied summary judgment on the issue of infringement by equivalents.

At trial, the jury was asked to determine whether Metaullics had infringed claim 1 of the patent literally, and whether it had infringed claims 1, 2, 3, 6, 8, 9, 15, 16, 18, and 27 under the doctrine of equivalents. The jury found that Metaullics had not literally infringed claim 1; that it had infringed claims 1, 2, 3, 6, 8, 15, and 16 under the doctrine of equivalents; and that it had not infringed claims 18 and 27 under the doctrine of equivalents. Claims 1, 2, 3, 6, 15, and 16 all include the "non-volute" element or rely on claims that include it. Claim 8 claims:

> A rotor as claimed in claim 6, further comprising a flow-blocking and bearing plate coaxially mounted on one face of said member and sized to rotatably fit and be guided by a bearing ring annularly mounted in defining the inlet opening.

Claim 6, upon which claim 8 depends, claims:

> A rotor for a submersible molten metal pump which has a pump casing having a cylindrical non-volute pump chamber de-fined therein, at least one inlet opening, and a tangential discharge opening, said rotor comprising an imperforate polygonal member having a center axis and being sized to fit in the inlet opening.

## 2. Application of *Festo* to the Present Case

■ In *Festo, supra,* the Federal Circuit held: "When a claim amendment creates prosecution history estoppel with regard to a claim element, there is no range of equivalents available for the amended claim element. Application of the doctrine of equivalents to the claim element is completely barred ..." *Id.* at 1872. "[A] narrowing amendment made for any reason related to the statutory requirements for a patent will give rise to prosecution history estoppel with respect to the amended claim element." *Id.* at 1870. *Festo* applies retroactively. *See id.* at 1929 (Newman, J., concurring in part and dissenting in part).

In this case, Metaullics argues that the amendment to claim 19 created a prosecution history estoppel that applies in this case even though claim 19 is not a claim in suit. In opposition to this argument, MMEI cites *Fiskars, Inc. v. Hunt Manufacturing Co.,* 221 F.3d 1318 (Fed.Cir. 2000).

A careful examination of *Fiskars* shows that it cannot support MMEI's position. In *Fiskars,* the patent in suit was U.S. Patent No. 5,322,001, for a paper cutter with circular blades. Essentially, the invention was a cutting board with a rail positioned slightly above it, attached to it by posts. A carriage assembly was attached to the rail and could slide along it. Within the assembly was a blade for cutting the paper. The assembly rested on a spring such that the person using the cutting board had to apply pressure to the assembly to expose the blade, allowing it to cut the paper. The relevant portion of Claim 6 of the patent reads as follows:

A paper cutting or trimming device comprising ... a pair of spring blades formed on said carriage assembly for *supporting and biasing* said carriage assembly to an inoperative position on said rail assembly ...

U.S. Patent No. 5,322,001 (issued Jun. 21, 1994) (emphasis added). No other claim in the patent includes the "supporting" element, although several other claims include the "biasing" element. On appeal, Hunt Co., the infringer, argued that "any infringing spring must perform the dual roles of biasing and supporting the blade assembly." *Fiskars, supra* at 1323. It argued prosecution history estoppel as to claims other than claim 6 on the grounds that claim 6 was amended to include a supporting as well as a biasing function. The Federal Circuit rejected the argument:

Although claim 6 may be subject to prosecution history estoppel as to this element [i.e., "support"], the other claims in suit are not. Claims whose allowance was not due to a particular argument are not subject to estoppel deriving from that argument.

*Id.*

In *Fiskars*, no other claim contained the "support" element. Apparently, the patent examiner found those claims patentable even though they lacked the support element. In the present case, on the other hand, the claims in suit *do* contain the "non-volute" element. Thus the questions presented in *Fiskars* and in the present case are different. In *Fiskars*, the question was whether the addition of an element to one claim during the prosecution of the patent creates an estoppel as to the claims the patent examiner allowed without the added element, i.e., the claims that the patent examiner found did not require the added element in order to avoid the prior art or in order to be otherwise patentable. In the present case, unlike in *Fiskars*, the element added to one claim appears in the other claims of the patent. The question is whether, assuming that

*Festo's* complete bar rule applies to the "non-volute" element in claim 19, thereby eliminating any range of equivalents, a broader range of equivalents should be allowed when the "non-volute" element appears in other claims. "[U]nder the doctrine of equivalents, [there is] no reason to assign different ranges of equivalents for the identical term used in different claims in the same patent, absent an unmistakable indication to the contrary." *American Permahedge, Inc. v. Barcana, Inc.*, 105 F.3d 1441, 1446 (Fed.Cir.1997).Thus, if *Festo* applies to claim 19, and if "non-volute" as it appears in that claim is entitled to no range of equivalents, then "non-volute" as it appears in *any* claim is entitled to no range of equivalents. Therefore, the Court will proceed to apply *Festo.*

Under *Festo,* this Court must engage in a four-step inquiry. First, the Court must determine which claim limitations are alleged to be met by equivalents. Second, it must determine whether those limitations were amended during prosecution of the patent. Third, it must consider whether the amendments narrowed the literal scope of the claim. Finally, the Court must determine whether the amendment was unrelated to one of the statutory requirements for patentability. *See Pickholtz v. Rainbow Techs., Inc.,* 125 F.Supp.2d 1156, 1162–63 (N.D.Cal. 2000) (discussing four-part test).

Here, the claim limitation alleged to be met by equivalents is "non-volute." As noted above, the non-volute limitation was added to claim 19 during prosecution. It is clear that the amendment narrowed the literal scope of claim 19, as before the amendment it claimed a "pump chamber" and after the amendment it claimed a "non-volute pump chamber." The amendment was related to a requirement for patentability, because the purpose of the amendment was to overcome the patent examiner's obviousness objection. Therefore, under the four-part test of *Festo,* "non-volute" is entitled to no range of equivalents in claim 19. Moreover, for the

reasons given above, "non-volute" is entitled to no range of equivalents in the other claims in which it appears.

### 3. New Trial

#### A. MMEI's procedural objection to the motion

MMEI points to the "judgment" entered on September 7 in an attempt to show that Metaullics's motion must be considered as a motion to vacate a judgment under Rule 60(b) rather than a motion for a new trial. The purported judgment of September 7 has caused much controversy in this litigation, and this Court finds that it was improvidently and perhaps erroneously entered on the docket. In any case, the parties have, at an earlier stage of this litigation, reported to the Court their agreement that the September 7 judgment did not represent a final judgment of the Court. Rule 60(b), by its terms, applies to final judgments. Therefore, the Court rejects MMEI's argument, which is without merit.

#### B. Standard for granting a new trial

■ Under Fed.R.Civ.P. 59, the Court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." "A special verdict question may be so defective in its formulation that its submission constitutes reversible error. A judgment entered upon an answer to a question which inaccurately frames the issue to be resolved by the jury must be reversed." *Umpleby v. Potter & Brumfield, Inc.*, 69 F.3d 209, 214 (7th Cir.1995) (citations omitted). Under Fed.R.Civ.P. 61, a legal error is not grounds for granting a new trial unless

refusal to grant a new trial appears to the Court to be inconsistent with substantial justice.

#### C. The erroneous special verdict questions

■ The special verdict contained the following question:

> Has MMEI proved by a preponderance of the evidence that the accused Metaullics' L–Series pumps listed in Appendix B [of the verdict form] literally or equivalently possess the disputed "cylindrical non-volute pump chamber," "means .. engaging," and "coupling means" and therefore infringe claim 1 of the Cooper '681 patent under the doctrine of equivalents?

The special verdict contained similar questions regarding the other claims in suit. For present purposes, the noteworthy feature of all of the similar questions is that in each of them, the jury was asked to decide whether the accused pumps in question literally *or equivalently* had a non-volute pump chamber. Thus it is impossible to determine from the jury's answers to these questions whether it found that the pump chambers were *literally* non-volute, or whether they were equivalent to non-volute chambers. Metaullics submitted a proposed special verdict form that would have allowed the Court to determine whether the jury had found the pump chambers were literally non-volute, or instead whether they were only equivalent to non-volute chambers. This Court declined to adopt Metaullics's proposed special verdict form. Metaullics timely objected to the Court's decision not to use its proposed questions.[1]

---

1. MMEI objects that Metaullics's objection was not sufficiently particularized. But in the cases its cites, *Liquid Air Corp. v. Rogers*, 834 F.2d 1297 (7th Cir.1987), *Matei v. Cessna Aircraft Co.*, 35 F.3d 1142 (7th Cir.1994), *Davis v. Ampthill Rayon Workers, Inc.*, 446 F.Supp. 681 (D.C.Va.1978), *aff'd* 594 F.2d 856 (4th Cir.1979), and *Allied Bank–West, N.A. v. Stein*, 996 F.2d 111 (5th Cir.1993), there was no indication of a change in the law

between the verdict and the final judgment that rendered the instructions erroneous. It would be a harsh rule indeed that required a particularized objection to a special verdict question based upon a case that had not yet been decided, especially when, as in this case, the intervening change in the law was a clear departure from earlier precedent that the parties could hardly have been expected to anticipate.

■ Given this Court's application of *Festo, supra*, the special verdict form contained legal error. The jury may have decided that the accused pumps had the equivalent of a non-volute pump chamber. Under *Festo*, such a conclusion is impermissible, as the term "non-volute" is not entitled to any range of equivalents. The error is not harmless, as it could make a difference in the outcome of the case. *See Delta & Pine Land Co. v. Sinkers Corp.*, 177 F.3d 1343, 1352 (Fed.Cir.1999). In these circumstances, the Court finds it would be inconsistent with substantial justice to allow the jury's verdict to stand. Therefore, Metaullics is entitled to a new trial.

### 4. Motion For Judgment As A Matter of Law

Metaullics contends that the Court should grant judgment as a matter of law, disposing of the entire case, because no reasonable jury could find, on retrial, that MMEI is entitled to a verdict on literal infringement, which is the remaining theory upon which MMEI could prevail. Metaullics suggests that there was no evidence at trial that the pump chambers considered at trial actually were non-volute under the definition of that term that the Court adopted after the *Markman* hearing.

At trial, MMEI's expert testified that various of Metaullics's accused pumps "have a curve in the chamber wall that is significant enough to properly be a spiral and perform as a volute." The Court agrees that "non-volute," as defined in the *Markman* order, is a structural term, a matter of geometry. The functionality of Metaullics's pumps is therefore irrelevant to the question of literal infringement, and for the reasons given above, literal infringement is the only theory on which MMEI can prevail in light of *Festo*.

MMEI cites other evidence in an attempt to show that a jury could have believed Metaullics's pumps were non-volute. It points to a comparison between plaintiff's exhibits 538 and 536, for instance, but the Court will not consider this comparison because exhibit 538 is not in evidence (Tr. at 538). It also cites the testimony of Metaullics's president, Richard Chandler, but his testimony, like the expert testimony cited above, has to do with functionality and thus goes to equivalency rather than to literal infringement.

Thus Metaullics may well be correct that the evidence at trial was not sufficient to show literal infringement. But the thrust of MMEI's case was infringement under the doctrine of equivalents, which became an untenable theory only after the jury's verdict. Therefore, this Court finds it is most fair to MMEI to deny the motion for judgment as a matter of law on literal infringement. On the other hand, this Court has no desire to re-try the issue of infringement unless necessary. Therefore, the Court will construe Metaullics's motion for judgment as a matter of law as a motion for summary judgment. MMEI now must demonstrate to the Court that a genuine issue of material fact with respect to literal infringement exists. In order to give MMEI guidance in formulating its response, the Court finds it appropriate to make the following observations.

The Court reserved for the jury the question of how close to a perfect circle a pump chamber must be before it would become a non-volute pump chamber. Thus, for example, at trial, the Court said: "There are jury questions involved in how much of a spiral they have to have before—or how little of a spiral you have to have before it becomes volute instead of non-volute. And that is an issue the jury is going to have to decide." (Tr. at 622). The Court ruled similarly in its order granting in part and denying in part Metaullics's motion for summary judgment. There, it held: "MMEI is correct in that the simple existence of a curve, even if it continuously increases, does not necessarily create a spiral."(Mem. and Order of Jun. 13, 2000, at 7).

At first glance, these rulings seem to conflict with the *Markman* order quoted above, because they seem to suggest that Metaullics's pumps, which indisputably have a generally increasing cross-sectional area as the outlet of the chamber is approached, may still be non-volute. But as suggested above, some curves are not pronounced enough to be called "spirals." Thus even if a pump has a generally increasing cross-sectional area, its curvature may be sufficiently slight that it cannot be called a "spiral." There is, in other words, a space within which MMEI may argue that an accused pump with a generally increasing cross-sectional area is *literally* not spiral in shape, and therefore literally infringing.

If the Court were to reconsider its Markman ruling de novo, it might decide that any pump chamber with a generally increasing cross-sectional area is volute. However, the Court is reluctant to change a ruling that has fundamentally shaped such a lengthy and costly litigation. (Of course, the Court has no discretion but to follow the rulings of the Court of Appeals when, as in this case, it changes a basic rule of the game before a final judgment). The Court finds that the best course of action at this late point in the case is to adhere to the *Markman* definition.

In its submission to this Court, then, MMEI should present evidence, if it can, that is sufficient to allow a reasonable fact-finder to conclude that the accused pumps have curvatures so small that the pump chambers are not spiral in shape. For example, MMEI could submit an affidavit from an expert witness containing his opinion that "the curvature of [particular accused pump chambers] is not sufficiently pronounced that the pump chamber can be called spiral in shape." The Court will *not* credit evidence having to do with the functionality of the accused pumps, for the reasons stated above.

### 5. Conclusion

For the foregoing reasons, Metaullics's motion for a new trial (docket no. 380) is granted, and its motion for judgment as a matter of law (docket no. 380) is denied. Within twenty days of the entry of this order, MMEI shall file with the Court a brief with supporting affidavits or other evidence as explained above. The permanent injunction previously entered in this case (docket no. 321) is vacated. The outstanding post-trial motions (docket nos. 376, 377, and 378) are denied as moot.

IT IS SO ORDERED.